MUMFORD COVE ASSOCIATION, INC., et al., Plaintiffs,

Stanley J. Pac, Commissioner of Environmental Protection, Plaintiff-Intervenor,

v.

The TOWN OF GROTON, CONNECTICUT, Defendant.

The MUMFORD COVE ASSOCIATION, INC., et al., and Stanley J. Pac, Commissioner of Environmental Protection, Plaintiffs,

v.

The CITY OF GROTON, CONNECTICUT; Catherine J. Kolnaski, Mayor; The Groton City Council, Diane Contino, Biagio Donatelli, Eleanor Gergen, George Gregory, Jr., Jack Kelley, Peter Racich, Jr.; the City of Groton Conservation Commission, Longene J. Chmura, Chairman, William C. Spicer, Jr., Anthony Skiff, Lorraine Santangelo, Winnifred Bonney, Thomas Filburn, Doris Donatelli; the City of Groton Planning and Zoning Commission, Waldren Higgins, Betsy Gibson, Harry Santangelo, Phillip Bergeron, Richard Kowaleski, Arthur Greenleaf, III, James Contino, Eugene T. Ramsey, Deborah Dey; City of Groton Harbor Management Commission, John Spicer, Chairman, Edward Sheer, Thomas Clay, Frederic Franzius, Zene Gergen, David J. Franco, Frank Scheetz; Frank Varella, City of Groton Highway Superintendent and Tree Warden; Elliot Barnes, City of Groton Zoning and Building Official; William Clinton, City of Groton Director of Utilities; and the Town of Groton, Connecticut, Defendants to the Order to Show Cause.

Civ. A. No. H 84–1256 (JAC).

United States District Court, D. Connecticut.

Oct. 29, 1986.

Mark R. Sussman, Charles Yuen, Murtha, Cullina, Richter & Pinney, Hartford, Conn., for plaintiffs, The Mumford Cove Ass'n and Its Individually-Named Members.

Richard F. Webb, Asst. Atty. Gen., State of Conn., Hartford, Conn., for plaintiff-intervenor Stanley J. Pac, Com'r, Dept. of Environmental Protection.

Gregory A. Sharp, Sharp & Berger, Hartford, Conn., James F. Brennan, Suisman, Shapiro, Wool, Brennan, Gray & Faulkner, P.C., New London, Conn., for defendant Town of Groton.

Kathleen Eldergill, Beck & Eldergill, Manchester, Conn., for City of Groton, et al., defendants to the Order to Show Cause.

Timothy D. Bates, Copp, Berall & Hempstead, New London, Conn., for defendant Conservation Com'n of the City of Groton, et al.

Philip Tuthill (House of Representatives, State of Conn.), amicus curiae, pro se.

## MEMORANDUM OF DECISION AND ORDER

JOSÉ A. CABRANES, District Judge:

Since 1974, when the Town of Groton (the "Town") replaced a smaller sewage treatment plant with a large one, the Town has been discharging effluent into Fort Hill Brook, upstream from Mumford Cove. These discharges have "changed Mumford Cove from a tidal saltwater embayment, abounding in diverse plant and animal life and fit for human use, into a brackish water choked monoculture of algae excluding beneficial aquatic plant life." *Mumford Cove Association v. Town of Groton*, 786 F.2d 530, 532 (2d Cir.1986). On November 30, 1984, the Mumford Cove Association and its individually-named members (the

"Association") brought suit pursuant to the citizens' suit provisions of the Clean Water Act, 33 U.S.C. § 1365 (the "Act"). In their action for declarative and injunctive relief the Association sought to compel the Town of Groton to comply with a National Pollutant Discharge Elimination System ("NPDES") permit issued by the Connecticut Department of Environmental Protection ("DEP") under authority granted by the Federal Environmental Protection Agency ("EPA"). One condition of the NPDES permit required the Town to comply with DEP Order No. 964, which called for the completion of a sewer outfall to direct discharges from the Town's sewage treatment plant to the Thames River by no later than October 31, 1979.

In February 1985, Stanley J. Pac, the Commissioner of the DEP, successfully moved to intervene as a party-plaintiff.[1] In the same month, the City of Groton (the "City") and the City of New London (jointly, the "Cities") moved to intervene as defendants. This court denied the Cities' motions to intervene on April 29, 1985, holding that DEP Order No. 964 was final and could not be collaterally attacked. The Cities were permitted, however, to participate in this action as *amici curiae* and were served with copies of all filings in this case. *See Mumford Cove Association, Inc. v. Town of Groton,* 640 F.Supp. 392, 393 n. 1 (D.Conn.1986) (relevant procedural background described). This court's denial of the Cities' motion to intervene was affirmed by the Court of Appeals on March 20, 1986. *Mumford Cove Association v. Town of Groton,* 786 F.2d 530 (2d Cir. 1986).

In a ruling of February 26, 1986, this court granted partial summary judgment for the plaintiffs on their federal claims, *see* Counts I and II of the Amended Complaint (filed May 9, 1985), based, *inter alia,* upon its findings that

[i]t is undisputed that the defendant failed to comply with the effluent limita-

tions and reporting requirements of its NPDES permit on 1,902 days between December 1, 1979, and December 31, 1985. It is also undisputed that the defendant has been in constant violation of its NPDES permit and [DEP] Order No. 964 since at least December 1, 1979, for having failed to construct the proposed sewer outfall. The defendant has offered the court no basis to excuse any of these violations of the Clean Water Act.

*Mumford Cove Association, Inc. v. Town of Groton,* 640 F.Supp. 392, 397 (D.Conn. 1986) (the "Ruling").

In granting partial summary judgment for plaintiff on its federal claims, this court required the parties to submit a proposed order to effectuate its Ruling. After further briefing and argument by the parties and *amici curiae,* the court on June 10, 1986 formally entered an order granting plaintiffs the relief they requested (the "June 10, 1986 Order").

The June 10, 1986 Order required the Town to undertake whatever action is necessary to construct a sewer outfall through the City to direct discharges from the Town's sewage treatment plant to the Thames River, in accordance with the Town's NPDES permit and DEP Order No. 964 and a stated timetable.

Paragraph 6 of the order stated, in full: *FURTHER INJUNCTIVE RELIEF.* Defendant, Town of Groton, its officers, agents, servants, employees, and attorneys and all persons, boards, agencies, commissions, subdivisions, firms and corporations in active concert or participation with it who receive actual notice of this Order by personal service or otherwise are hereby enjoined from taking any action including, without limitation, complying with any local or state orders or rulings purporting to or tending to stay or enjoin actions required by this Order, which would frustrate or impede effectuation of this Order or compliance with the Federal Clean Water Act.

*Association v. Town of Groton,* 786 F.2d 530, 534 (2d Cir.1986).

---

[1]. For a general description of the respective roles of state and federal agencies under the Federal Clean Water Act, *see Mumford Cove*

In paragraph 7(c) of the June 10, 1986 Order, the court retained jurisdiction, *inter alia*,

> to issue such orders as are necessary or appropriate to effectuate and protect this Order and compliance with the Federal Clean Water Act, and prevent interference by any person with this Court's Order; and to issue such orders as are necessary or appropriate in aid of this Court's jurisdiction.

Copies of the June 10, 1986 Order were served on the City, its chief executive officer, the City Conservation Commission (the "Conservation Commission"), the City Harbor Management Commission, Anthony Skiff, William C. Spicer, Jr. and State Representative Philip Tuthill, among others. In addition, a legal notice advising the public that the June 10, 1986 Order was available for inspection at the City Clerk's office and other locations was published in the area's principal newspaper, *The New London Day.*

In response to this court's orders, the Town has taken several steps in an effort to build the required outfall in accordance with the schedule laid out in the June 10, 1986 Order. One of these steps was the application for a so-called inland wetlands permit from the Conservation Commission, a local board empowered under C.G.S. § 22a–42(c) to promulgate regulations "to protect the wetlands and watercourses within its territorial limits." After two hearings, at which only the Town presented expert testimony, the Conservation Commission on July 1, 1986 voted unanimously to deny the Town's application.

In response to this and other developments, plaintiffs have filed motions for injunctive relief against the City, the Conservation Commission, the Town, and numerous individuals. These latest motions are designed to prevent any further interference with the construction of the sewer outfall in accordance with this court's June 10, 1986 Order. On August 12, 1986, this court entered an Order to Show Cause why an injunction should not enter enjoining the City, the Conservation Commission, the Town and a number of other persons, as requested in plaintiffs' motions.[2]

In response to the Order to Show Cause, extensive briefs and exhibits were submitted to this court, including the entire record of the Conservation Commission's decision of July 1, 1986. Evidentiary hearings were held on September 17, 1986 and September 24, 1986, at which the court heard the testimony of three witnesses: William Blanker, Director of Public Works for the Town; Robert J. Norwood, an engineer with the DEP; and William C. Spicer, Jr., a member of the Conservation Commission and the Chairman *pro tem* at the time of the hearings on the Town's application. Extensive argument was also heard from counsel and others who entered an appearance.

The court now enters the following findings of fact and conclusions of law, in accordance with Rule 52, Fed.R.Civ.P.

## FINDINGS OF FACT

### *History of this Litigation*

1. On November 30, 1984, the Association brought this civil action against the Town pursuant to section 505 of the Act, 33 U.S.C. § 1365. Stanley J. Pac, Commissioner of the DEP, successfully moved to intervene as a party-plaintiff in February 1985. (The Association, its individually-named members, and the DEP are collectively referred to herein as "plaintiffs").

2. On February 22, 1985, the City, at that time joined by the City of New London, simultaneously filed a Motion for Leave to Intervene as defendants and a motion to

---

**2.** It should be noted, however, that although the Town is still nominally the defendant in the main action and is a named defendant on the current motion for injunctive relief, the Town is now in full agreement that, unless enjoined, the City of Groton, its agents, and other individuals associated with the City and its agencies will continue to take actions designed to frustrate its compliance with this court's June 10, 1986 Order. Accordingly, at the hearings on the Order to Show Cause (filed Aug. 12, 1986), the Town was effectively aligned as a party-plaintiff.

dismiss the Association's complaint on the grounds that enforcement of DEP Order No. 964, which directs construction of a sewer outfall through the City to the Thames River, was not ripe.

3. On April 29, 1985, this court denied the Cities' motion to intervene as defendants, holding that DEP Order No. 964 was final and could not be collaterally attacked, and that the consideration of alternatives for purposes of federal construction grants has no relation to enforcement of the Town's NPDES permit. The Cities were permitted, however, to participate in this action as *amici curiae* and were served with copies of all filings made in this case. *See* Ruling, 640 F.Supp. at 393 n. 1; Certified Official Transcript of April 29, 1985 Hearing (filed May 23, 1985) ("4/29/85 Tr.").

4. The Cities appealed this court's order denying their motion to intervene to the United States Court of Appeals, which on March 20, 1986 affirmed this court's order. *Mumford Cove Association v. Town of Groton*, 786 F.2d 530 (2d Cir.1986). The Court of Appeals agreed with this court that DEP Order No. 964 is final and not now subject to collateral attack. 786 F.2d at 534–535. Moreover, the Court of Appeals rejected the Cities' argument that the state order was not entitled to full faith and credit under 28 U.S.C. § 1738, declaring that

> [t]he Cities[ ] may not "bootstrap" themselves into a more advantageous position and—by failing to seek state review of an adverse decision—be allowed to argue that the administrative Order is subject to challenge in federal court, when such attack otherwise would have been precluded.

786 F.2d at 535 (citations omitted). Finally, the Court of Appeals found, on the record of this case, that the DEP adequately protects the Cities' interest in the quality of the Thames River. *Id.*

5. On May 9, 1986, the Court of Appeals granted the Association's motion for an award of attorney's fees against the Cities and remanded that matter to this court for a determination of the appropriate amount of such fees.

6. While the Cities' appeal to the Court of Appeals was pending, plaintiffs moved for summary judgment on their claims that the Town had violated the Act in the past, and was continuing to, violate the Act by failing to construct a new sewer outfall to the Thames River and by exceeding certain effluent limitations in the Town's NPDES permit. Amended Complaint (filed May 9, 1985), Counts I and II.

7. On December 3, 1985, counsel for the Cities requested the court to extend the time for responding to plaintiffs' motions for summary judgment until two weeks after the issuance of the decision of the Court of Appeals on the Cities' appeal. The court denied the Cities' request on December 17, 1985. Although the Cities received copies of the motions and supporting documents, as well as the calendar setting the date for argument, the Cities declined to file any memoranda of law with respect to the motions or to participate in oral argument.

8. This court granted plaintiffs' motions for summary judgment on Counts I and II of the Amended Complaint in the Ruling entered on February 26, 1986. 640 F.Supp. 392 (D.Conn.1986). The court held, in part, that the Town "has been in constant violation of its NPDES permit and [DEP] Order No. 964 since at least December 1, 1979, for having failed to construct the proposed sewer outfall" to the Thames River. *Id.* at 397. The court directed the Town "to undertake whatever action is necessary to achieve full compliance with its NPDES permit and [DEP] Order No. 964 as expeditiously as possible," and directed the parties to submit a proposed order effectuating its Ruling. *Id.*

9. In its Ruling, this court also rejected the Town's argument that it could not construct the outfall through the City without the City's consent:

> the suit asks that the defendant be required to comply with a valid order of the Commissioner of Environmental Protection of the State of Connecticut.

There is nothing in Conn.Gen.Stat. § 7-246 that even purports to limit the power of the State of Connecticut to order a town to construct an outfall through the territory of one of its subdivisions.

*Id.*

10. On March 21, 1986, the court held oral argument on the proposed order effectuating its Ruling. At that hearing, the Cities appeared through counsel to object to the proposed order. *See* Certified Official Transcript of March 21, 1986 Hearing (filed April 15, 1986). At the Cities' request, the Cities and the other parties were allowed to file briefs concerning the proposed order, and an additional hearing was held on June 10, 1986, at which the court further considered the arguments of the Cities in opposition to the proposed order. *See* Certified Official Transcript of June 10, 1986 Hearing (filed June 17, 1986).

11. Among the Cities' objections to the order was their claim that DEP Order No. 964 does not require construction of a sewer outfall through the City to the Thames River. Memorandum of Law of the City of Groton and the City of New London in Opposition to the Proposed Order Dated April 1, 1986 (filed April 7, 1986) at 9-10. The court rejected this argument because the City had previously conceded that DEP Order No. 964 required construction of an outfall through the City. *See* 4/29/85 Tr. at 5-7. Furthermore, the undisputed Affidavit of Fred S. Banach confirms that the route selected by the Town is consistent with DEP Order No. 964 and "in terms of point of entry into the Thames River, is virtually identical to Alternate II, Route C" of the Hayden and Harding outfall report that is referred to in DEP Order No. 964. Affidavit of Fred S. Banach (dated April 14, 1986), *attached to* Plaintiffs' Memorandum of Law in Support of Proposed Order Effectuating the Court's Ruling on Motions for Partial Summary Judgment (filed April 14, 1986) at 4. Indeed, the entire record of this case demonstrates that the City has known for years that DEP Order No. 964 mandates construction of an outfall through the City to the Thames River.

12. On June 10, 1986, this court orally entered an order, entered in typescript form on June 12, 1986, effectuating its Ruling that the Town has been in continuing violation of the Act (the two versions of the order are referred to herein as "the June 10, 1986 Order"). The court's June 10, 1986 Order sets forth detailed compliance schedules, requiring the Town: (a) to construct a sewer outfall through the City to direct the discharges from the Town's sewage treatment plant to the Thames River in accordance with the Town's NPDES permit and DEP Order No. 964, and (b) to achieve full compliance with its NPDES permit.

13. The June 10, 1986 Order further enjoins the "Town of Groton, its officers, agents, servants, employees and attorneys and all persons, boards, agencies, commissions, subdivisions, firms and corporations in active concert or participation with it who receive actual notice of this Order … from taking any action, including without limitation, complying with any local or state orders or rulings purporting to or tending to stay or enjoin actions required by this Order, which would frustrate or impede effectuation of this Order or compliance with the federal Clean Water Act." June 10, 1986 Order, ¶ 6.

14. Copies of the June 10, 1986 Order were served on the City, its chief executive officer, the City Conservation and Harbor Management Commissions, Anthony Skiff, William C. Spicer, Jr. and State Representative Philip Tuthill, among others. In addition, a legal notice advising the public that the June 10, 1986 Order was available for inspection at the Clerk's Office of the City and at other locations was published in *The New London Day.* June 10, 1986 Order, ¶ 8.

### The City's Opposition to the Thames River Outfall

15. The City of Groton is a political subdivision of the defendant Town of Groton. The City's residents are citizens of the Town and vote to elect the Town's governing representatives. The Charter of

the City of Groton, Article 1, Section 3, provides that "[t]he inhabitants of the Town of Groton domiciled within the limits designated in section one [the corporate limits of the City of Groton] shall be entitled to all the privileges and subject to all the burdens of said town in the same manner and to the same extent as though this act were not in effect." Record Ex. G–100. The Court of Appeals concluded that "inasmuch as the City of Groton is a subdivision within the Town its interests ... appear adequately protected by that municipality." *Mumford Cove Association v. Town of Groton, supra,* 786 F.2d at 535.

16. The City has opposed construction of the Thames River outfall since the DEP first ordered the Town to construct the outfall in 1975. In June 1975, the City and the Town requested an administrative hearing on DEP Order No. 964 Modified, which required construction of the outfall to the Thames River. Defendant City of Groton's ("D's") Ex. A. After consideration of the evidence, the hearing officer approved, and the Commissioner of DEP affirmed, the order directing construction of the Thames River outfall. *Id.* (Copies of DEP Order No. 964, each of its modifications and the DEP's final decision are annexed as exhibits to the Affidavit of Robert Norwood (dated May 29, 1985), submitted in support of Plaintiffs' Motion for Partial Summary Judgment on the Second Count (filed May 29, 1985)).

17. In 1979, in response to inquiries made by the City, the DEP reaffirmed that the administrative appeal process had been exhausted and that the Thames River had been chosen as the acceptable discharge location. *See* Affidavit of Fred S. Banach (dated March 14, 1985) (post-hearing summary, p. 3), *attached as Exhibit 3 to* Joint Memorandum In Opposition To Motion of the City of Groton for Leave To Intervene (filed March 15, 1985).

18. On January 10, 1980, the City Conservation Commission wrote to the Connecticut Department of Agriculture, the Connecticut Department of Health, and the U.S. Fish and Wildlife Service seeking support in opposing an outfall to the Thames River. Record Exs. H–3, H–4, H–5.

19. On February 5, 1980, the City's Conservation Commission unanimously voted to return the Town's application to construct the sewer outfall through a red maple swamp in the City. The Conservation Commission asserted that it was returning the application because it was incomplete. Record Ex. H–11. Two days later, the Mayor of the City commended the Conservation Commission for its "extraordinary efforts assisting us in discouraging the State mandated sewer outfall route through the City of Groton." Record Ex. H–12.

20. On November 2, 1982, the City's Conservation Commission unanimously voted to submit comments to the Town's Water Pollution Control Authority ("WPCA") objecting to the construction of an outfall to the Thames River, and recommending that "no further consideration be given to removal of the outfall from Fort Hill Brook...." Record Exs. H–21, H–22.

21. The Town's WPCA held a public hearing on November 16, 1982 to solicit comments on the Thames River outfall. Plaintiff's ("P.'s") Ex. 3. At that hearing Anthony Skiff, one-time Deputy Mayor under Mayor Kolnaski, coordinated the City's opposition to the outfall at the request of the Mayor of the City. Skiff stated in that hearing that the City is "unalterably opposed to any outfall terminating in the Thames River." P.'s Ex. 3 at 64–65.

22. In October 1982, the City, alleging that the outfall would cause unreasonable pollution, filed an intervention petition with the DEP. P.'s Ex. 2. On November 19, 1982, the City, through its attorneys, formally requested that the DEP review the continued viability of DEP Order No. 964 and "that any further consideration of the Thames River outfall project be suspended pending that determination." P.'s Ex. 4.

23. The opposition of the City to the Thames River outfall runs so deep that it has been institutionalized in the City's Municipal Coastal Program ("MCP") purportedly adopted under the Coastal Manage-

ment Act, Conn.Gen.Stat. § 22a–90 et seq.; *see e.g.*, §§ 22a–101, 22a–104. The City's MCP includes the following goal and policy:

> Adamantly oppose the construction of the proposed Town of Groton sewer outfall through the City which will discharge into the Thames River.

P.'s Ex. 1 at VII–3. According to the MCP, any "future development within the Groton coastal zone must satisfy both state and *local* policies." (emphasis added) *Id.* at VII–1.

24. Following the issuance of this court's temporary restraining order on June 12, 1985, directing, *inter alia,* the parties to meet to attempt to settle this action, the Town redesigned the outfall route to move the discharge approximately 4000 feet to the north and to avoid completely any inland wetlands in the City. *See* Certified Official Transcript of September 17, 1986 Hearing (filed September 29, 1986) ("9/17/86 Tr.") (testimony of Walter Blanker). The Town's WPCA held another public hearing on this outfall route, known as the Electric Boat route, on December 10, 1985. P.'s Ex. 6 (transcript of hearing).

25. At the December 10, 1985 public hearing, Ms. Kathleen Eldergill, counsel for the Cities, publicly stated to the Town's WPCA, in behalf of the Cities, that "no outfall is ever going to be built without the cooperation of those cities." P.'s Ex. 6 at 24. Ms. Eldergill also declared that if the Town builds the Thames River outfall, the Town will be

> trading one lawsuit for another, because the City of Groton and the City of New London are going to have just as much right as the people in Mumford Cove to go into Federal Court and file lawsuits saying, "We don't want the outfall here."

*Id.* at 25–26. Ms. Eldergill concluded her remarks with the following statement:

> One of the costs the Town should be taking into consideration is the cost of doing battle with the people of the City of New London, the City of Groton, if they intend to build the sewer outfall through the E.B. route. Because con-

trary to what the report says, *the cities are opposed to that route, will be opposed, and will do everything in their power to prevent that being built.*

*Id.* at 30. (emphasis supplied)

26. Anthony Skiff also appeared at the December 10, 1985 hearing and stated that the route to the Thames River is "objectionable, unfair and impossible." He stated that "we would fight it [the outfall] to the bitter end." P.'s Ex. 6 at 62.

27. Prior to the December 10, 1985 hearing of the Town's WPCA, the City Conservation Commission voted unanimously to oppose the outfall at the WPCA hearing. Record Ex. H–21. L.J. Chmura, Chairman of the Conservation Commission, identified numerous City, state and federal permits that would be needed to build the outfall, and stated "of course, a law suit from the City is inevitable." P.'s Ex. 6 at 75. William C. Spicer, Jr., Conservation Commission member and its occasional chairman *pro tem,* also attacked the projected outfall. P.'s Ex. 6 at 55–62.

28. Following the December 10, 1985 hearing of the Town's WPCA, the Mayor of the City wrote a letter to William C. Spicer, Jr., to thank him for his support at the hearing on the Thames River outfall, stating: "Your time and support in opposing any outfall going into the Thames will help the City in keeping the outfall out of the City and from going into the Thames.... The City will do everything in its power to protect our City and our river." P.s' Ex. 7.

29. On December 16, 1985, the City of Groton City Council unanimously passed the following resolution opposing the Thames River outfall:

RESOLUTION OPPOSING AND DISAPPROVING A SEWER OUTFALL COMING THROUGH CITY TO EMPTY INTO THAMES

WHEREAS, the sewer outfall into the Thames River may pollute coastal areas and local beaches, and

WHEREAS, the health, safety and welfare of all Groton residents must be protected, and

WHEREAS, our rivers, beaches and waterways must be preserved and upgraded, and,

WHEREAS, the Mayor and Council and City residents will continue to do all in our power to prevent the outfall from going into the Thames River,

THEREFORE BE IT RESOLVED that the Mayor and Council oppose and disapprove a sewer outfall coming through the City to empty into the Thames.

P.'s Ex. 8. The Mayor wrote to the Governor to express that opposition. *Id.*

30. The City of Groton, its Mayor, its Conservation Commission, and its Harbor Management Commission, and Anthony Skiff and William C. Spicer, Jr., intervened before the DEP to oppose the Town's application to the DEP for a water resources permit to construct the outfall. P.'s Exs. 11, 16. At hearings on January 16, 1986 and February 4, 1986, the City, its agencies and officials argued, *inter alia,* that the DEP had to reconsider alternatives to the outfall, including the use of advanced wastewater treatment. P.'s Ex. 16, Final Decision at 2; *see also* Conservation Commission Brief to the DEP, Record Ex. H–48. The Commissioner of the DEP rejected the City's arguments, finding that the "environmental effects of this activity are minimal." The Commissioner also found that the project is a facility in the national interest, as defined in the Coastal Management Act, Conn.Gen.Stat. § 22a–93(14)(D), and is consistent with the goals and policies of that state statute. P.'s Ex. 16 at 2.

31. On December 31, 1985, the City also wrote to the U.S. Army Corps of Engineers to object to the issuance of a Corps structures permit for the outfall, once again objecting to "inadequate consideration of all feasible alternatives." Record Ex. H–34.

32. The City and its Conservation Commission each provided opposing comments to the DEP during the state environmental impact evaluation process that was conducted for state funding purposes. P.'s Ex. 13, Record Exs. H–36, H–37, H–46. The City in its comments repeated its demand, made four years earlier, that the DEP "review the continuing viability" of DEP Order No. 964, *see* P.'s Ex. 4 (letter to DEP dated November 19, 1982), and stated that "any action taken to comply with [DEP] Order [No.] 964 should be delayed until after the environmental impact evaluation is completed." P.'s Ex. 13.

33. The opposition of the City, its agencies and officials, and some of its residents, to the outfall continues to this day, despite the entry of this court's June 10, 1986 Order, requiring construction of the Thames River outfall. Since June 10, 1986, the City and its agencies and officials and some of its citizens have taken the following overt actions in an effort to obstruct or undermine this court's orders:

(a) On June 24, 1986, the City filed a Petition for Declaratory Ruling with the DEP alleging that the outfall, as designed by the Town, does not conform to the requirements of DEP Order No. 964. P.'s Ex. 22. Once the DEP rules on the petition, the City could, under Conn.Gen.Stat. § 4–175, file an action in state Superior Court challenging the DEP's ruling. The concept for this potential suit appears to have been suggested by Conservation Commission Chairman *pro tem* Spicer in a letter to Ms. Eldergill dated April 25, 1986. Record Ex. H–41.

(b) On June 19, 1986, the City submitted to Governor William O'Neill petitions signed by more than 700 city residents supporting "the actions of the Mayor and City Council in their efforts to oppose the construction of the Town sewer outfall through the City of Groton and into the Thames River and urg[ing] them to continue their effort in opposing the Thames Sewer Outfall project." P.'s Ex. 15. The petitions were signed by several of the defendants to the Order to Show Cause, including Mayor Kolnaski; Councilmen Donatelli, Gregory, Gergen, and Kelley; Conservation Commissioners Chmura, L. Santangelo, and William C. Spicer, Jr.; Harbor

Management Commissioner John Spicer; Planning and Zoning Commissioners Higgins, L. Santangelo, Bergeron, and Kowaleski; and City Zoning Official Barnes, among others. *Id.*

(c) On July 1, 1986, the City's Conservation Commission unanimously denied the Town's application for an inland wetland permit to construct portions of the outfall adjacent to (but not through) four small regulated areas within the City. Record Ex. G-90.

(d) On August 8, 1986, the City filed suit in state Superior Court challenging the DEP's issuance of a water resources permit authorizing construction of the outfall structure and pipeline river crossings. P.'s Ex. 18.

(e) Some City officials have also continued to use their position in the Town to try to frustrate compliance with this court's June 10, 1986 Order. For example, on August 13, 1986, Phillip Bergeron, a City Planning and Zoning Commissioner and a member of the Representative Town Meeting ("RTM"), opposed the authorization to condemn easements needed for the outfall, stating that he "could not vote Yes on any issue involving sewer outfall." P.'s Ex. 24, at 13.

(f) On August 19, 1986, the City filed suit in this court challenging the U.S. Army Corps of Engineers' permit authorizing construction of the outfall. *City of Groton v. Department of the Army, Corps of Engineers,* Civil Action No. H 86–899 (JAC), P.'s Ex. 19.

### *The Conservation Commission's Permit Denial*

34. The DEP has jurisdiction over the entire outfall project. Conn.Gen.Stat. § 22a–2.

35. The DEP's Commissioner of Environmental Protection is charged with carrying out "the environmental policies of the state" and has "all powers necessary and convenient to faithfully discharge this duty." Conn.Gen.Stat. § 22a–5.

36. The Conservation Commission, composed of residents of the City, prescribes and implements regulations pursuant to the Connecticut Inland Wetlands and Watercourses Act, Conn.Gen.Stat. §§ 22a–36 to 45. The purpose of the statute is to protect "wetlands and watercourses from random, unnecessary, undesirable and unregulated uses, disturbance or destruction." Conn.Gen.Stat. § 22a–36. Under this statute, the City's Conservation Commission has regulatory jurisdiction to protect inland wetlands and watercourses within the boundaries of the City from "random, unnecessary, undesirable and unregulated uses, disturbance or destruction."

37. Effective December 10, 1985, the Conservation Commission amended its regulations by expanding the definition of a "regulated activity" to bring within the Conservation Commission's jurisdiction any activity within 75 feet of a wetland or watercourse. Record G–99, Regulations for the Protection and Preservation of Inland Wetlands and Watercourses, § 2.1.7.

38. In compliance with this court's ruling of February 26, 1986 Order, the Town's WPCA, *see* Conn.Gen.Stat. § 7–245, *et seq.,* applied to the City's Conservation Commission on March 31, 1986 for approval of the construction of its sewer outfall pipeline at four locations where the proposed pipeline passes within 75 feet of inland wetlands or watercourses within the City. Record G–5 through G–14. "Wetlands," for the purposes of Conn.Gen.Stat. §§ 22a–28 *et seq.,* are identified by soil type, and include, for example, "poorly drained" soil. Conn.Gen. Stat. §§ 22a–38(15).

39. The Town's WPCA proposed plans for a northerly route to the Thames River which runs generally westward from the Town boundary along Thomas Road, then northwest along Shennecossett Road, then through the Town golf course and so-called Pfizer property, then along Shennecossett Road, Benham Road, Harmacy Place and Eastern Point Road and along the common boundary line of Amerada Hess and Elec-

tric Boat into the Thames River. Record Ex. G–48.

40. The WPCA proposed this northerly route as an alternative to a previous proposal along a more southerly route which it had submitted to the Conservation Commission in 1980. The prior proposal, which would have required significant excavation and filling in a red maple swamp, was withdrawn as a result of concerns raised by the Conservation Commission. Record G–21, Attachment (Letter from City's Conservation Commission to Town's WPCA, dated February 7, 1980).

41. On March 26, 1986, counsel for the Town requested, by letter to the Mayor of the City, that the City Council appoint alternates to the Conservation Commission. Town Ex. C.

42. At the time the Town made the request, the Conservation Commission had no appointed alternates, and the WPCA had determined that Conservation Commission members William C. Spicer, Jr. and Anthony Skiff should not participate in deliberations upon the application because of their frequent public comments in opposition to the sewer line and Spicer's ownership of land adjacent to one of the areas of proposed construction. Record Ex. G–22.

43. In compliance with this court's February 26, 1986 Ruling and order to the Town to "undertake whatever action is necessary to achieve full compliance with its NPDES permit and [DEP] Order No. 964 as expeditiously as possible," see ¶ 8, supra, the WPCA applied to the Conservation Commission on March 31, 1986 for approval of the construction of its sewer outfall pipeline at four locations where the proposed pipeline passes within 75 feet of inland wetlands or watercourses within the City. Record Exs. G–5 through G–14.

44. None of the four activities for which the WPCA sought approval is within the boundary of the wetlands or involves activity in the watercourses themselves. Record Ex. G–47. The four activities included:

Location # 1: Installation of the sewer pipe within seventy-five (75) feet of mapped inland wetlands near Birch Plain Creek;

Location # 2: Installation of the sewer pipe in Shennecosset Road fifty (50) feet from the wetlands;

Location # 3: Installation of the sewer pipe in Shennecossett Road at Shennecossett Golf Course ten (10) feet from the wetlands;

Location # 4: Installation of the sewer pipe in Shennecossett Road ten (10) to fifty (50) feet from the wetlands.

Id.

45. The wetlands indicated for locations "1" and "4," see ¶ 44, supra, are shown on the Commission's Official Inland Wetlands Map. The wetlands indicated for locations "2" and "3," id., are not designated as wetlands on the Official Inland Wetlands Map but were identified by the WPCA's soil scientist. Record Ex. G–50.

46. The Conservation Commission's regulations provide for an expedited review process by permitting an applicant to seek a Declaratory Ruling if the proposed activity is not within the Conservation Commission's jurisdiction, or a Summary Ruling if the proposed activity will not have a significant impact or major effect on inland wetlands or watercourses. Record Ex. G–99, Regulations for the Protection and Preservation of Inland Wetlands and Watercourses, §§ 2.1.7; 6.2; 6.3.

47. Pursuant to the Conservation Commission's regulations, see ¶ 46, supra, the WPCA in its application requested a decision from the Conservation Commission that, because the proposed activities would not take place or have any effect on the wetlands or watercourses, they were either not regulated or, in the alternative, were regulated but did not have a significant impact or major effect on wetlands or watercourses. Record Exs. G–87, G–23.

48. On April 1, 1986, at a regularly scheduled meeting of the Conservation Commission which lacked a quorum, counsel for the WPCA requested that Commissioners Spicer and Skiff, who were present, not participate in the deliberation of its application due to their prior statements

and actions and due to Spicer's ownership of land abutting the construction activity at Location "1," *see* ¶ 44, *supra*. Record Exs. G–3, G–15.

49. At the April 1, 1986 meeting, Spicer indicated that the entire Conservation Commission endorsed his opposition to the outfall proposal, that if he were to disqualify himself on that account, the entire Conservation Commission would have to do the same, and that there would then be no one available to issue the permit. Record Exs. G–3, G–15.

50. On April 4, 1986, counsel for the WPCA wrote to the Conservation Commission, advising it of the WPCA's concerns over the participation of Spicer and Skiff in the proceedings. Record Ex. G–3.

51. On or about April 8, 1986, the Conservation Commission held a special meeting concerning the plaintiff's application, at which the WPCA's counsel again requested the disqualification of Spicer and Skiff. At this meeting, Spicer served as Chairman *pro tem*, and requested a brief on the disqualification issue from the WPCA and from attorneys for the Conservation Commission. Record Ex. G–15, at 1, 3.

52. At the April 8, 1986 meeting, representatives from the WPCA explained the application to the Conservation Commission, presented additional supporting information and answered questions on the application. Record Ex. G–15.

53. On April 11, 1986, Spicer wrote to counsel for the WPCA raising a number of questions concerning the application, and requesting additional information. Record Ex. G–17.

54. On May 5, 1986, counsel for the WPCA filed a memorandum on the claimed impropriety of Spicer and Skiff deliberating on the application, with documentation of their previously expressed opposition to the outfall route. Record Ex. G–22.

55. On May 5, 1986, counsel for the WPCA also filed a memorandum in support of its petition for Declaratory or Summary Rulings. On the same date, counsel for the WPCA wrote to the Conservation Commis-

sion and addressed the questions raised by Spicer's letter of April 11, 1986, *see* ¶ 53, *supra*. The letter also requested rulings from Spicer and Skiff on their disqualification from the proceedings, and sought a decision from the Conservation Commission on the petitions for Declaratory or Summary Rulings. Record Exs. G–23, G–21.

56. On May 6, 1986, the Conservation Commission held a regularly scheduled meeting and discussed the application of the Town's WPCA. Record Ex. G–31; Town Ex. B, at 3–45.

57. At the meeting of May 6, 1986:

(a) Spicer served again as Chairman *pro tem*, despite the WPCA's request for recusal, and Spicer again requested briefs from attorneys for the Conservation Commission on the propriety of his and Skiff's participation in the deliberations. Town Ex. B, p. 7; Record Ex. G–31, at 2.

(b) Spicer and Skiff did not recuse themselves, nor did the Conservation Commission rule on the petitions for Declaratory or Summary Rulings. Record Ex. G–31, Town Ex. B, at 3–45.

(c) The Association intervened as a party in the administrative proceeding before the Conservation Commission. Record Ex. G–31, at 2.

(d) The Conservation Commission scheduled a public hearing on the application despite the pendency of the petitions for Declaratory or Summary Rulings. Record Ex. G–31, p. 8.

(e) Although the May 6, 1986 meeting was not a regularly convened public hearing, Spicer requested members of the public present to comment on the application and advise the Conservation Commission on whether the application provided any benefit to the city. Record Ex. G–31, p. 2 and *passim*; Town Ex. B, at 10.

58. On May 15, 1986, counsel for the WPCA wrote to Spicer, as Chairman *pro tem*, again requesting a ruling by him and Skiff on their disqualification from the proceedings prior to the public hearing scheduled for May 20, 1986. In this May 15, 1986 letter, WPCA's counsel also requested

a decision on the petition for Declaratory and Summary Rulings immediately following the May 20, 1086 hearing. Record Ex. G–42.

59. On May 20, 1986, the Conservation Commission held a public hearing on the application. Prior to the public hearing, Skiff and Spicer ruled that they would participate in the proceedings and that they believed that they could be impartial in making a decision on the application. Record Ex. G–56, at 7–12.

60. At the May 20, 1986 public hearing, the Town, in support of its application, introduced testimony and other evidence by:

(a) A certified soil scientist, verifying the actual wetland locations and the fact that the outfall pipe would not pass through any wetlands. Record Exs. G–56, at 46–61; G–13; G–26.

(b) A botanist, confirming that the environmental impact upon the four wetland habitats would be negligible. Record Exs. G–56, at 61–73; G–14; G–28; G–51.

(c) The District Conservationist for the United States Department of Agriculture Soil Conservation Service, advising that the sedimentation and erosion control plans were adequate to protect water quality. Record Exs. G–12, G–18, G–33, G–45, G–65, G–66, G–67 and G–68.

(d) Various engineers, describing the installation and operation of the sewer line, and confirming the reliability of the pipe itself. Record Ex. G–56, at 73–98.

61. On May 27, 1986, although the record of the public hearing was closed, Chairman Chmura of the Conservation Commission wrote to the counsel for WPCA, requesting further answers to several questions which were raised at the May 20, 1986 public hearing. The letter also advised that a second public hearing would be held on the application, despite the arguably doubtful authority for such a second hearing, see Conn.Gen.Stat. § 22a–42a, purportedly to permit rebuttal from the public on the plaintiff's answers to the Conservation Commission's questions. Record Ex. G–57.

62. The Conservation Commission made extraordinary demands for information from the Town. For example, the Commission asked for proof that the pipeline would withstand earthquakes and also requested evidence that the pipeline would not transmit "hostile viruses such as Cancer, Hepatitis and Aids [sic]." Record Ex. G–57. In his testimony before this court on September 24, 1986, Spicer reiterated that questions concerning the possible spread of AIDS and Hepatitis viruses were relevant. See Certified Official Transcript of September 24, 1986 Hearing (filed Oct. 9, 1986) ("9/24/86 Tr.") at 232.

63. The Conservation Commission scheduled a second public hearing for June 23, 1986. See ¶ 61, supra, Record Exs. G–58, G–59.

64. At the June 23, 1986 public hearing (held nearly two weeks after the entry of this court's June 10, 1986 Order), Spicer, again chairing the hearing pro tem, solicited comments from State Representative Philip Tuthill, who offered testimony (seemingly irrelevant to the application) attacking the Connecticut Council on Environmental Quality and making a variety of claims against counsel for the Town. Record Exs. G–85, at 112–123; G–60, G–76, G–77, G–78, G–79.

65. Following Tuthill's testimony, the Town's WPCA presented its written answers and provided oral responses to a number of questions and offered additional written documentation to the Conservation Commission showing the strength and safety of the sewer pipe and addressing other issues raised by the Conservation Commission. Record Ex. G–85, at 125–222.

66. At the close of the June 23, 1986 public hearing, at the request of counsel for the Town's WPCA and the Association, the Conservation Commission ruled on the petitions for Declaratory or Summary Rulings, denying both. Record Ex. G–85, at 155–156.

67. The application, supporting documents submitted by the WPCA and unrebutted expert testimony offered by the WPCA at two public hearings through a professional engineer, a certified soil scientist, and a professional botanist (which evidence was submitted to this court at the hearings of September 1986), establish the following:

(a) The pipeline, as proposed in the current plans requires no excavation, filling or other construction activity within the wetlands or watercourses of the city. Record Exs. G–13, G–26, G–50; G–56, at 16, at 46–61, at 30–31.

(b) The plans for the proposed pipeline involve no stockpiling of materials in wetlands or watercourses. Record Exs. G–50; G–56, at 18–19.

(c) The plans for the proposed pipeline provide sedimentation and erosion control measures which are adequate to protect the wetlands and watercourses from siltation during construction. Record Exs. G–50, G–12, G–13, G–18, G–33, G–45, G–56, G–65, G–66, G–67, G–68.

(d) The plans for the proposed pipeline provide that in all areas adjacent to wetlands and watercourses, the land will be returned to its original grades. Record Ex. G–56, at 19.

(e) The plans for the proposed pipeline involve no stormwater run-off or other discharge to wetlands or watercourses. Record Exs. G–47, G–50; G–56, at 32–33.

(f) The construction of the proposed pipeline in accordance with the plans will have no significant impact on the vegetative community in the four wetlands locations. Record Exs. G–56, at 61–73; G–14, G–28, G–51.

(g) The possibility of leakage of treated effluent from the pipe into the wetlands or watercourses is minimized to the greatest extent possible given present levels of technology through pipe specifications, rigorous on-site performance testing prior to acceptance and use, a leakage factor five times more stringent than industry standard, and off-site monitoring of flow pressure and volume. Record Exs. G–72, G–75, G–80, G–83; G–85, at 167–201; see 9/24/86 Tr. at 276, et seq. (testimony of Robert Norwood, DEP).

68. At the hearing before the City's Conservation Commission, no expert testimony was offered in opposition to the WPCA application and none of the Conservation Commission members qualified themselves as experts in any of the areas relevant to the application. Record Exs. G–56, G–85; see 9/24/86 Tr. at 190. Likewise, no expert testimony was offered by the defendants to the Order to Show Cause in evidentiary hearings held in this court on September 17, 1986 and September 24, 1986. See 9/17/86 Tr. and 9/24/86 Tr., passim.

69. On July 1, 1986, the Conservation Commission voted unanimously to deny the permit to the Town's WPCA, Record Ex. G–80, for reasons set forth in a document dated July 1, 1986 and entitled "Findings of Fact." Record Ex. G–89.

70. The Conservation Commission's "Findings of Fact" were, in toto, as follows:

1. Two inland watercourses are crossed.

2. One tidal watercourse is crossed.

3. Watercourses contained in conduits or pipes are considered to be the class of the stream segment to which they discharge.

4. The discharge into the Thames River is inside the west boundary of the City.

5. Four of the applicants' maps show wetlands within 75 feet of the construction.

6. The construction requires a ditch which will alter the hydrology of its entire length.

7. The specifications for the pipe include leakage allowance.

8. There is no provision for monitoring the leakage except casual visual check.

9. Any leakage will gather at the low points which are the wetlands and will leach or drain into the ground water and surface streams.

10. The effluent has been catagorized [sic] in the Mumford Cove suit as "untreated or improperly treated sewerage [sic] which consists of human, animal and industrial wastes, which are filthy, putrefactive and noxious," *etc.*

11. The DEP has joined this complaint.

12. The DEP has jurisdiction over the discharge, but has not controlled it.

13. The City has its own sewer system.

14. The Town of Groton Charter guarantees autonomy to all its subdivisions.

15. The City contributes nothing to the Town WPCA, use or support.

16. There are no benefits to the City to offset the damages, permanent trespass, and wetlands and ground-water pollution.

17. There are risks to the health, welfare, safety and property of the 10,000 people of the City of Groton without offsetting benefits.

18. Other alternatives within Order 964 exist which will not impact the Poquonnock River, Birch Plain Creek, Thames River, beaches or any City environs.

19. Cost is not a reason for site selection when wetlands are involved.

Record Ex. G–89.

71. Spicer was the author of the Conservation Commission's "Findings of Fact."

72. Spicer has acknowledged that "Findings" 1, 2, 10, 11, 12, 13, 14, 15, 18, and 19, *see* ¶ 70, *supra,* are not relevant in that they are beyond the Conservation Commission's jurisdiction. *See* 9/24/86 Tr. at 226, *et seq.*

73. Spicer's testimony that the Conservation Commission does not intend to regulate beyond its jurisdiction is not credited.

74. Spicer's testimony that he is not opposed to the outfall as a "concept" is not credited.

75. Spicer's testimony that the Conservation Commission had not prejudged the Town's application prior to its hearings thereon is not credited.

76. Even those Conservation Commission "Findings of Fact" that are arguably within the Conservation Commission's limited jurisdiction, *see* ¶¶ 70, 72, *supra,* are not supported by the record.

77. The Conservation Commission exceeded its own narrowly limited jurisdiction under state law and did so with the conscious design to obstruct and impede the implementation of DEP Order No. 964 and this court's June 10, 1986 Order.

78. The Conservation Commission's actions are fully consistent with the long, well publicized, and well documented opposition of the City and its agencies and officials, and some of its citizens, to the construction of the outfall through its territory.

### Need for Injunctive Relief

79. Unless this court enters an order enjoining further obstructionist conduct, the City, its agencies, officials or others named in the Order to Show Cause will continue to conduct their purposeful campaign to undermine the authority of federal law, the State DEP and this court, and to impede the lawful efforts of the Town to obey the requirements of DEP Order No. 964 and the orders of this court.

80. The past actions and statements of the City, its agencies and officials, and some of its citizens, in opposition to the Thames River outfall clearly demonstrate that these parties will do everything in their power to prevent the outfall required by this court's June 10, 1986 Order from being built.

81. The Commissioner of DEP, having found that the Town was polluting Mumford Cove, a navigable water of the United States subject to protection under the Act, ordered construction of the Thames River outfall in 1975. However, the continuing and vehement opposition of residents of the City and Town prevented the aggressive or effective enforcement of the state order

until the Association brought the instant suit.

82. The pollution of Mumford Cove has been allowed to continue for far too long. This court's June 10, 1986 Order was entered to remedy this unacceptable and illegal pollution as expeditiously as possible, thereby fulfilling Congress' objective "to restore ... the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a)(1).

83. Any actions by the City, its agencies, officials or residents, or any other person, that would have the effect of delaying, preventing or frustrating compliance with this court's June 10, 1986 Order will cause plaintiffs, the Town and the public irreparable harm.

84. In order to comply with this court's June 10, 1986 Order, the Town would have to begin construction of the sewer outfall project by November 1986. *See* 9/17/86 Tr. at 109 (testimony of William Blanker).

85. The DEP and the Town have appealed the Conservation Commission's decision in state court. Record Ex. A, B.

86. This action was taken only to assure that the DEP's and the Town's interests would be protected in the event this court does not act. *See* 9/17/86 Tr. at 127.

87. Even under the best of circumstances, those appeals would not be decided until early 1987. *See* Connecticut Practice Book § 257.

88. Plaintiffs have no adequate remedy at law. Regardless of whether the state court ultimately upheld the Conservation Commission's decision, or remanded the matter to the Conservation Commission for futher proceedings, any such proceedings would tend "to stay or enjoin actions required by [the June 10, 1986] Order." June 10, 1986 Order at ¶ 6.

89. The City's denial of the inland wetlands permit, if it is enforced against the Town, will frustrate compliance with this court's June 10, 1986 Order and the Federal Clean Water Act. The Conservation Commission has already threatened to take enforcement action against the Town if it

proceeds without a permit. Record Ex. G–57.

90. The City's denial of a permit effectively prohibits construction of the outfall. Even if the outfall could be redesigned to satisfy the Conservation Commission, such a redesign would cause a delay in the outfall's construction and thereby frustrate compliance with this court's June 10, 1986 Order. Moreover, further proceedings before the Commission would in itself cause delay.

91. Since the June 10, 1986 Order enjoins the Town from complying with any ruling "purporting or tending to stay or enjoin actions required by [the June 10, 1986] Order," June 10, 1986 Order at ¶ 6, *see,* ¶ 88 *supra,* the state court could not adequately and completely determine the controversy among the parties.

92. This court has had jurisdiction over the outfall controversy since 1984. The court entered its June 10, 1986 Order to correct, as expeditiously as possible, long-standing violations of the Federal Clean Water Act. The effective disposition of this case, including the enforcement of the court's orders, requires that the court take jurisdiction over the entire outfall controversy.

93. If the City, its agencies, officials, residents and other persons are allowed to pursue in various state courts, and before various local and state agencies, collateral attacks on this court's orders, judgments and decrees, effectuation of the remedy required by the DEP of the State of Connecticut and by this court to abate pollution of the nation's waters will be frustrated. Further pollution of Mumford Cove and violations of the Federal Clean Water Act will inevitably follow. The public interest clearly necessitates that all challenges and objections to the Thames River outfall be heard and decided in this court in order to avoid the delay, expense and inconsistent adjudications incident to litigation of these issues in diverse state and federal fora.

94. Unless restrained by this court, the City, its agencies and officials and some of

its citizens, and others, can be expected to institute and continue collateral attacks on DEP Order No. 964 and this court's June 10, 1986 Order in various state and federal fora.

### Other Steps Necessary to Construct the Outfall

95. The DEP has issued the Town the necessary permits to construct the Thames River outfall. P.'s Exs. 16, 17.

96. The U.S. Army Corps of Engineers has also issued the Town the necessary permit to construct the outfall, including the pump station. P.'s Ex. 14.

97. As required by this court's June 10, 1986 Order, the Town has awarded the contract for construction of the pump station. P.'s Ex. 20. The Town has given the pump station contractor notice to proceed with construction. *Id.*

98. As required by paragraph 1.b(c) of this court's June 10, 1986 Order, the Town has submitted final plans and specifications for the pipeline and outfall structure to the DEP and the DEP has approved those plans and specifications as being consistent with DEP Order No. 964. P.'s Ex. 26. The Town has also begun advertising for bids for the pipeline and outfall structure contracts. P.'s Ex. 23.

99. On September 8, 1986, the Town filed an application with the City's Highway Department for an excavation permit. P.'s Ex. 21. Such permits are routinely issued by the City for similar construction work. 9/21/86 Tr. at 115 (testimony of William Blanker).

100. The City contends that the Town must also receive coastal site plan approval from the City's Planning and Zoning Commission, and a special permit and site plan approval under section 4.0 of the City's zoning regulations from that same Commission. *See* Answers to Town of Groton Interrogatory No. 2., Docket No. 163. The latter special permit is for filling and removing earth products only in those areas not subject to the highway excavation permit. Section 4.11, Zoning Regulations,

Town Ex. A. The special permit assertedly required under Section 4.0 of the zoning regulations is intended to insure that excavation sites are restored insofar as possible to facilitate, and not impede, appropriate development in the area.

### CONCLUSIONS OF LAW

This court has jurisdiction over the parties and the subject matter of this action pursuant to the Federal Clean Water Act, 33 U.S.C. § 1365, and 28 U.S.C. § 1331. The court has ancillary jurisdiction under the All Writs Act, 28 U.S.C. § 1651 and its inherent powers to issue all writs necessary or appropriate in aid of its jurisdiction against persons or entities who are "in a position to frustrate the implementation of a court order or the proper administration of justice ... and encompasses even those who have not taken any affirmative action to hinder justice." *United States v. New York Telephone Co.*, 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977) (citations omitted); *see also In re Baldwin-United Corp.*, 770 F.2d 328, 338 (2d Cir. 1985) (same). Having found as a matter of fact that the actions of the City Conservation Commission were outside its jurisdiction and were designed to frustrate this court's June 10, 1986 Order, it is clear that this court has jurisdiction and may take remedial action under the All Writs Act and federal common law, including decisions of the United States Court of Appeals for the Second Circuit.

### Abstention

■ A finding that there have been, and will continue to be, attempts to frustrate this court's orders, also necessarily disposes of the claim that a state court is the only forum that can review the Conservation Commission's denial of the inland wetlands permit. However, the City and the Conservation Commission argue that this court should exercise its discretion and abstain from exercising its jurisdiction in order to allow the state appellate review process to run its course. They make two arguments in support of this position. First, they

point out that it is the DEP and the Town themselves who have taken an appeal from the Conservation Commission's decision to the Superior Court, pursuant to Conn.Gen.Stat. § 22a–43. Second, they argue that *United States v. District of Columbia*, 654 F.2d 802, 810 (D.C.Cir.), *cert. denied sub. nom., Prince George's County v. United States*, 454 U.S. 1082, 102 S.C. 637, 70 L.Ed.2d 616 (1981) (*"District of Columbia"*), upon which the plaintiffs and the Town rely heavily for the proposition that a federal court may enjoin state and local agencies and courts in order to vindicate the Federal Clean Water Act, differs from the instant case in that *District of Columbia* involved a consent order signed by the very party who then attempted to relitigate the issue. Neither argument is persuasive.

■ In the first place, it is curious that a political subdivision of a state should invoke principles of "federalism" and "comity"—principles which govern federal-state relations—in litigation that finds the state firmly aligned with parties invoking federal law against that very political sub-division. It bears recalling, moreover, that counsel for the DEP is the only attorney able to represent the interests of the State of Connecticut in this case, and thus it is the state and the Association that jointly seek declaratory and injunctive relief against a subdivision that has been found to be in violation of both federal and state law.

The argument against federal court intrusion in state court proceedings has a surface plausibility, but it is similarly hollow. We are not here confronted by a situation that suggests, much less requires, that a federal court invoke principles of comity, or accord deference and consideration to the co-equal judicial system of a state government in order to minimize friction between our federal and state systems. *Compare, e.g., Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982) (comity and deference in habeas corpus litigation); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) ("comity" and "Our Federalism" as forbidding federal court injunctions directed at pending state criminal prosecutions absent extraordinary circumstances). In this instance, Connecticut's judicial system has no special interest or stake in the litigation that the parties to the federal suit have brought, or might wish to bring, to the state courts. The federal courts, in acting to preserve and protect their jurisdiction over the subject matter of this lawsuit, do not in any sense purport to sit in judgment on the practices or processes of the state courts. In sum, the interests of the state courts *qua* courts are simply not at issue here. The plaintiffs (including the state) and the Town took their appeal of the decision of the Conservation Commission to state court only to protect their rights in the event the federal courts were unpersuaded by their argument. They have clearly and consistently argued that this court is the only appropriate forum to resolve this dispute. *See, e.g.*, 9/17/86 Tr. at 127. In any event, it is highly unlikely that this court will be required to consider, much less to enter, any injunction against a state court, although in the present circumstances an injunction against state court proceedings would be well within this court's authority. *See, e.g., James v. Belotti*, 733 F.2d 989, 993 (1st Cir.1984).

Furthermore, to accept the defendants' narrow characterization of the Conservation Commission's action as solely involving issues of state law, and thereby assertedly entitled only to normal state review, is to completely ignore reality. The application for the inland wetlands permit was a direct response to the February 26, 1986 Ruling of this court, and this court has found that the Conservation Commission's response was designed to frustrate and obstruct its authority. Accordingly, the federal court is necessarily the appropriate forum for dealing with any such resistance. Indeed, defendants' counsel has conceded as much. *See* 9/24/86 Tr. at 324–325 (statements of Ms. Eldergill). The argument that, in these circumstances, continued flagrant obstruction of federal court orders may be tolerated out of a deference to the co-equal state judicial system not only misperceives the nature of our federal system, but, alas,

the character of the state's own well-articulated interest in this very litigation.

Moreover, even if a state court could and did review the Conservation Commission's actions under an expedited schedule, as the City claims it would, the delay involved would still effectively preclude compliance with the schedule imposed by this court's orders. *See* Findings, ¶¶ 87–88, *supra*.

Finally, only this court, which has the entire case before it, can possibly afford complete relief to an aggrieved party. The June 10, 1986 Order requires the Town to take numerous steps. If the City were allowed to litigate each of its continuing efforts to obstruct or avoid compliance with the June 10, 1986 Order in separate state proceedings, the orders of this court would be frustrated regardless of the ultimate result of any particular state proceeding. The City has already lost the principal case, in which it attempted to stop the enforcement of DEP Order No. 964 and the construction of the sewer outfall through its territory; what it seeks now, in the guise of litigating "other issues," is to delay the project itself, in the knowledge that any delays, and especially prolonged or indefinite delays, would be a victory in fact if not in name. To allow the City to take its delaying tactics into a variety of state fora out of a presumed respect for the integrity of state judicial and administrative processes would mock the State of Connecticut's own environmental processes, ten years of DEP efforts to enforce applicable law, and efforts by the federal courts to enforce the Federal Clean Water Act. Meanwhile, the unlawful pollution that has been affecting Mumford Cove for over a decade will continue.

The attempt to distinguish the *District of Columbia* case is also not persuasive. There is little significance in the fact that that case involved a consent order. As far as the exercise of a federal court's jurisdiction is concerned, the operative term is "order," not "consent." In a consent order, the agreement between the parties has no particular legal effect until and unless it is entered as an order of the court. Absent court action, the parties' agreement is, in effect, a legal nullity; when, however, the court enters its order, that order binds the parties in exactly the same way as any other judicial decree. "We reject the argument ... that a decree entered upon consent is to be treated as a contract and not as a judicial act." *United States v. Swift & Co. et al*, 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932) (Cardozo, J.) There is little to distinguish between a litigant who signs a consent order and then attempts to relitigate the issue and a litigant who professes its acceptance of a federal court ruling that an order is final and then attempts to relitigate it while denying it is doing so.

It should also be noted that the remedy adopted today is considerably less intrusive than that imposed by the district court in *District of Columbia*. First, in *District of Columbia* a state court had already entered an injunction and the district court enjoined compliance with the prior state court order. As already noted above, in the instant case, no state court has acted, and this court's order does not interfere with any state judicial decrees. Second, the remedy adopted by this court is structured to allow the defendants to the Order to Show Cause a continuing role in the decisions that will affect them. Only obstruction is forbidden; cooperation and constructive suggestions are encouraged. Finally, this court is not itself directly taking control of the sewer outfall project. Today's order places the on-going responsibility for the effectuation of the June 10, 1986 Order and DEP Order No. 964 where it properly belongs under both Connecticut and federal law, with the DEP of the State of Connecticut.

### The Parties Bound

In the past, defendants have emphasized the fact that they are not named parties to the main lawsuit and this Court's June 10, 1986 Order. It is now well established, however, that one need not be named in an injunctive order to be bound by it. *See, e.g., Washington v. Washington State*

*Commercial Fishing Vessel Association,* 443 U.S. 658, 692 n. 32, 99 S.Ct. 3055, 3078 n. 32, 61 L.Ed.2d 823 (1979); *United States v. New York Telephone Co., supra,* 434 U.S. at 174, 98 S.Ct. at 373; *In re Baldwin-United Corp., supra,* 770 F.2d at 338. More important, such a claim is simply untenable at this point in the proceedings. Not only did the defendants to the Order to Show Cause participate in the proceedings that led to the June 10, 1986 Order itself, they themselves are the named parties in the instant ancillary proceedings.

### Additional Conclusions

In accordance with the findings of fact and discussion above, the court hereby enters the following additional conclusions of law:

1. The City, its agencies, officials and residents were brought into this action by two orders to show cause secured by plaintiffs, and therefore, they must be considered parties for the purposes of the pending motions for injunctive relief. *See United States v. American Society of Composers, Authors and Publishers,* 442 F.2d 601, 605 (2d Cir.1971).

2. Plaintiffs' motion for an injunction is not governed by the requirements of Rule 65, Fed.R.Civ.P. *In re Baldwin-United Corp., supra,* 770 F.2d at 338. As the *Baldwin* Court observed: "Injunctions issued under the authority of the All-Writs Act stem from very different concerns than those motivating preliminary injunctions governed by Fed.R.Civ.P. 65." *Id.* In contrast to Rule 65 motions, which generally are designed to preserve the *status quo* pending a decision on the merits, injunctions such as that sought here "are needed to prevent third parties from thwarting the court's ability to reach and resolve the merits of the federal suit before it." *Id.* at 338–39.

3. This court has broad discretion to fashion remedies that will protect and effectuate its judgments, particularly when the public interest is involved. *See Golden State Bottling Co. v. National La-*bor Relations Board, 414 U.S. 168, 179–180, 94 S.Ct. 414, 422–23, 38 L.Ed.2d 388 (1973); *In re Baldwin-United, supra.* Persons who were not parties to the original action may be enjoined from interfering with the implementation of court orders which establish and protect public rights. *Washington v. Washington State Commercial Passenger Fishing Vessel Association, supra,* 443 U.S. at 692 n. 32, 99 S.Ct. at 3077 n. 32 (enjoining nonparties who participated as *amici curiae* from interfering with an enforcement of Indian fishing treaty). *See also United States v. Hall,* 472 F.2d 261 (5th Cir.1982). The actions of the City, its agencies and officials, and some of its residents, threaten to interfere with this court's efforts to remedy pollution of federally-protected waters of the United States.

4. The All Writs Act, 28 U.S.C. § 1651, and the Anti-Injunction Act, 28 U.S.C. § 2283, mandate "an examination of the effect a state proceeding would have on a prior federal judgment, rather than a comparison of formal causes of action." *District of Columbia, supra,* 654 F.2d at 810. "Where a state court enjoins a course of conduct which is necessary to comply with a prior federal court order, the federal court has authority to effectuate its order by enjoining the state proceeding." *Id.* Moreover, this court need not wait for a final judgment by a state court before acting to protect its own decrees. *In re Baldwin-United, supra,* 770 F.2d at 335; *District of Columbia, supra,* 654 F.2d at 810.

5. This court may, using the analysis above, enjoin any city administrative agency which in effect prevents, or purports to prevent, conduct necessary to comply with this court's June 10, 1986 Order.

6. In view of the breadth of the federal interest in protecting navigable waters like Mumford Cove, the courts have exercised broad equitable powers to mandate compliance with the Act, "even where the exercise of such powers has necessitated the bypassing of normal state decisional processes." *District of Columbia, supra,* 654 F.2d at 808.

7. DEP Order No. 964 is final and not now subject to collateral attack. *Mumford Cove Association v. Town of Groton,* 786 F.2d 530 (2d Cir.1986). The City and its agencies may not relitigate DEP Order No. 964 under the pretense of local "regulation," nor may they collaterally attack this state mandate to construct an outfall through the City to the Thames River by challenging the outfall in diverse local, state and federal fora.

8. The Conservation Commission acted outside its regulatory jurisdiction by attempting to regulate the Town's effluent discharges. The City has no authority to regulate the discharge of pollution from municipal waste water treatment plants. *See* Conn.Gen.Stat. § 22a–430; *Bredice v. City of Norwalk,* 152 Conn. 287, 292, 206 A.2d 433, 436 (1964). The Conservation Commission's decision to deny a permit in these circumstances is arbitrary, capricious, and unsupported by the evidence before it, and compliance with that decision would frustrate effectuation of this court's June 10, 1986 Order.

9. A stay of this matter pending further action by the City or the Conservation Commission is neither necessary nor appropriate, since it is clear that the Conservation Commission's reason for denying the Town's application arises from its objections to the outfall's effluent discharge and the record of this case demonstrates that any further proceedings before the Conservation Commission would be inconsistent with the schedule for construction of the outfall required by this court's June 10, 1986 Order to remedy violations of federal law and, in any event, would delay and impede implementation of this court's orders.

10. In view of the City's policy to oppose the outfall, as reflected in its Municipal Coastal Program, the City's Planning and Zoning Commission would effectively be required by the Municipal Coastal Program to deny Coastal Area Management site plan approval and the excavation special permit and site plan approval

claimed to be required by the City in its answers to the Town's interrogatories. Such denials would conflict with DEP Order No. 964 and would frustrate implementation of this court's June 10, 1986 Order. Accordingly, it is necessary to bypass normal planning and zoning procedures to protect and effectuate this court's jurisdiction.

11. In the circumstances of this case, protection of the public rights established by the Federal Clean Water Act and effectuated by this court's June 10, 1986 Order requires that all challenges and objections to the Thames River outfall be heard and decided in this court to avoid the delay, expense and potentially inconsistent rulings that would result from allowing litigation of the outfall controversy to proceed in a broad array of state and federal fora.

IT IS THEREFORE ORDERED THAT:

1. The City of Groton and its Conservation Commission are hereby enjoined from applying the City's Regulations for the Protection and Preservation of Inland Wetlands and Watercourses, as amended, to the Town of Groton sewer outfall mandated by DEP Order No. 964 Modified and this court's June 10, 1986 Order. The City and its Conservation Commission are further enjoined from the exercise of any regulatory or other authority over the outfall, except as provided for herein.

2. (a) The City of Groton and its Planning and Zoning Commission are hereby enjoined from exercising any regulatory, review or other claimed jurisdiction in respect to Coastal Area Management site plan approval or review of the construction of the sewer outfall mandated by DEP Order No. 964 Modified and this court's June 10, 1986 Order, provided, that if the DEP determines that any further review of the sewer outfall under the Coastal Management Act, Conn.Gen.Stat. § 22a–90 *et seq.,* is warranted, then the Town shall submit its final outfall plans and specifications to the DEP for such review at the time required by DEP and shall submit a copy of such plans and specifications to the City Planning and Zoning Commission.

(b) The City Planning and Zoning Commission may suggest, not later than the time and in the manner required by the DEP, that DEP require the Town to use any further reasonable construction measures to mitigate impacts during construction of the same kind as the Commission would ordinarily impose on the construction of City water, sewer or utility lines.

(c) The Town is hereby enjoined to construct the sewer outfall utilizing such construction-related mitigative measures as the DEP may deem customary, appropriate and necessary.

3. (a) The Town of Groton is hereby enjoined to submit within ten (10) days of this Order, to the City Planning and Zoning Commission and the DEP, final plans and specifications showing final grading and seeding for those portions of the sewer outfall route passing through the City which are not within a public right-of-way.

(b) Within ten (10) days of such application, the City Planning and Zoning Commission is hereby enjoined to issue such approvals as may be required under Article 4 of its Regulations, conditioned upon the use of all the environmentally-protective measures described in the Town's application to the City Conservation Commission.

(c) In the event the City Planning and Zoning Commission shall determine that during construction the Town should utilize further environmentally protective measures to mitigate construction-related impact of the same kind as would ordinarily be required for the construction of City water, sewer or utility lines, the City Planning and Zoning Commission may submit to DEP within ten (10) days of such application its comments explaining the mitigation measures it would ordinarily require and the reasons why such measures are needed. If the DEP shall deem such further environmentally-protective measures customary, appropriate and necessary, the Town shall construct the sewer outfall utilizing such measures.

4. (a) The City of Groton and its Highway Superintendent, Frank Varella, are hereby enjoined to issue within five days of the date of this Order, the highway excavation permit for which the Town applied on September 9, 1986, in accordance with the requirements and standards in City of Groton Ordinance No. 47, entitled "An Ordinance Regulating Street Openings, Excavations and Pavement Cuts Within The Limits Of Any Public City Highway By Persons Other Than The City Of Groton, Providing Penalties for the Violation Thereof And Repealing Ordinances In Conflict Therewith."

(b) The Town shall not be required to furnish a performance bond nor furnish a certificate of insurance, provided it requires its contractors to name the City of Groton as an additional insured in their liability policies which provide coverage for the sewer outfall construction project.

5. The City of Groton, its officers, boards, commissioners, agents, servants, employees and attorneys, and all persons, boards, subdivisions, firms and corporations in active concert or participation with them who receive actual notice of this Order are hereby enjoined from taking any action which would frustrate, delay or conflict with the Town of Groton's compliance with this court's June 10, 1986 Order, including but not limited to attempting to exercise, in any manner except as provided in this Order, any claimed authority, right, interest or power over the Town of Groton or any of its agents, persons or other entities acting in concert with it concerning the outfall project.

6. (a) The City of Groton, its officers, boards, commissions, agents, servants, employees and attorneys, and all persons, boards, subdivisions, firms and corporations in active concert or participation with them who receive actual notice of this Order are hereby enjoined from applying to any state court or other state or local governmental entity for application or enforcement of any law, regulation, permit, or lack of permit which application or enforcement has the effect, or potential effect, of delaying the Town's compliance with the June 10, 1986 Order, except upon prior application to and with the consent of this court.

(b) In particular, the City and the foregoing entities are enjoined immediately to withdraw the Superior Court action styled *City of Groton v. Stanley J. Pac* (return date August 26, 1986) (P.'s Ex. 18). The City may refile this appeal with the Clerk of this Court on or before November 24, 1986 if it desires review by this court.

(c) The DEP may rule upon the City's petition for declaratory ruling (P.'s Ex. 22), but the City, any party to this action and any person to which this injunction may apply may not seek any judicial review of any such DEP ruling, except before this court as provided herein.

(d) The Town of Groton, the DEP and the City of Groton Conservation Commission are hereby enjoined to request the Superior Court to stay the appeals brought by the Town and the Commissioner from the July 1, 1986 denial by the City of Groton Conservation Commission of an inland wetlands permit for the construction of the sewer outfall and in support thereof to submit this Order as an attachment. In the event that the Superior Court denies this request, the Town and the DEP are directed to return to this court for such further relief as may be necessary to effectuate this Order.

7. The Town of Groton is hereby enjoined from complying with the City of Groton Conservation Commission's July 1, 1986 denial of an inland wetlands permit or any other order of the City, its agencies or officials, or any person or entity acting in concert with the City, its agencies or officials, respecting the outfall and is further enjoined to proceed in accordance with this court's June 10, 1986 Order to construct the sewer outfall using all the environmentally protective measures described in the Town's application to the City of Groton Conservation Commission and in the permits issued by the State DEP and the U.S. Army Corps of Engineers.

8. All persons named in the orders to show cause, all parties to this action and all persons, firms and corporations in active concert and participation with them who receive actual notice of this Order are hereby enjoined from taking any actions which would frustrate, delay or impede effectuation of DEP Order No. 964 or this court's rulings and orders or interfere with the court's jurisdiction herein.

9. Any person, firm, corporation or entity, who believes that there exists good grounds for modification or rescission of any order entered herein or that they have a valid health or safety objection to the Town's sewer outfall that has not already been raised before or considered by the DEP, may bring such grounds or objections before this court by filing a motion describing the nature of such grounds or objections, the action requested of this court and the reasons and evidence in support thereof.